UNITED STATES v. SCHAFER et al.

(District Court, E. D. Pennsylvania. December 9, 1918.)

No. 89.

1. WAR ☞4—ESPIONAGE ACT—MAKING FALSE REPORTS.
   An indictment against newspaper publishers, under Espionage Act, for making false reports, etc., by altering original news dispatches before publication, is supported by evidence showing that, while defendants received no dispatches from news agencies, they took dispatches from other papers and so altered them as to give aid to the enemy.

2. WAR ☞4—ESPIONAGE ACT—MAKING FALSE REPORTS.
   It is not a defense to a prosecution for making false statements to promote the success of the enemy in time of war in a newspaper published by defendants that the statements were not made from motives of personal disloyalty, but to further the purposes of an organization of which the paper was the organ.

3. CRIMINAL LAW ☞862—JURY—APPLICATION OF PERSONAL KNOWLEDGE.
   The jury in criminal case may properly take cognizance of facts which are matters of general information.

Criminal prosecution by the United States against Peter Schafer, Paul Vogel, Louis Werner, Martin Darkow, and Herman Lemke. On motions in arrest of judgment and for new trial. Discharged.

See, also, 248 Fed. 290.

Samuel Rosenbaum, Asst. U. S. Atty., Francis Fisher Kane, U. S. Atty., and Owen J. Roberts, Sp. Asst. U. S. Atty., all of Philadelphia, Pa.

Wm. A. Gray, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. The reasons for a new trial in this case number 49 in all. Some of them are necessarily what may be characterized as formal. Many of the others indicate in their statement whether they are well or ill taken, and call for no discussion. This leaves for discussion three questions, two of which bear upon the course of the trial as affecting all of the defendants, and one as affecting two or possibly three of them.

[1] One of the questions presented may be thus stated: It goes to the proposition of charging a defendant with one offense and convicting him of a different offense, and one with which he has not been charged in accordance with legal forms. As a basis for the reason for a new trial advanced, the assertion is made with respect to certain counts in the indictment (those which may be called "false news" counts) that the theory upon which the indictment was framed is that a news dispatch emanated from a certain source and place, as, for illustration, an associated press dispatch from Berne or Amsterdam, and that the defendants altered this dispatch so as to change its meaning. The falsity is thus charged to have consisted in this alteration.

Another basis for the reasons for a new trial advanced is the further assertion that there was no proof of either the sending, receipt, or alteration of any such dispatches, and the inference is drawn that there

could be no lawful conviction of guilt of that charge in the absence of evidence to support it.

With respect to the evidence which was introduced, the further assertion is made that it was confined to what might support a charge that the defendants had published a false report, but was wholly barren of anything which would support the charge as made.

The basis for these assertions is the fact that the newspaper office from which the publication issued received no dispatches of any kind. The paper frequently contained what purported to be dispatches from the different news centers of the world, and they were so published as to present the appearance of being news which had come to the office by cable or otherwise. Their real origin was this: Newspapers printed in English and other languages came to the office. Those who had to do with the publication of the newspaper of the defendants made free use of the contents of other papers. In newspaper parlance, they "lifted" the news from other papers.

The real gravamen of the offense of which they were guilty, in so far as they were guilty, without regard to any of its purely legal aspects, was that they changed the news which they had thus "lifted" so as to give it a tone which would afford comfort and encouragement to the enemies of the United States, or would be injurious to our cause. It will thus be seen that in no aspect did the act which was committed differ in substance from the act which was charged. Whether it did so differ in the strictly legal view depends wholly upon what the indictment means by the phrase "original dispatch."

The thought entertained by the learned counsel for the defendants, and sought to be impressed upon the trial judge, and now reexpressed, is that the indictment charged a specific offense and charged it in the narrow sense of being the act of falsifying a dispatch which had emanated from a news collecting agency, and that the dispatch so changed was one which in fact had been received by the defendants.

The logical outcome of this thought is that the only evidence which would support such a charge would be the testimony of some one connected with such a news agency that such a dispatch had been sent to the defendants, followed by evidence of its contents, and further evidence that the dispatch had been published in a falsified form.

The trial judge refused to put this narrow construction upon the charge as laid in the indictment, but read it as expressive of a charge of the substantial offense of disseminating false statements which tended and were put out with intent to promote the success of the enemies of the United States.

The charge thus made would emphatically embrace the act of taking a news dispatch from another paper and so changing it as to make it serve a disloyal purpose. The dispatch so changed would be an "original dispatch" within the meaning of the indictment.

To give emphasis to the distinction sought to be expressed, we are of opinion although there is nothing in this case to require us to go so far, that the charge in substance would have been supported by proof that the defendants had wholly faked a dispatch, so that it had

no other origin than an emanation from the brain of the person who faked it.

The question as now presented is wholly an appellate question, and we take the view, as above expressed, because we deem it to be in line with the command of Rev. St. § 1025 (Comp. St. 1916, § 1691). As we view it, the motive for that command is a very practical one. A very short experience in the trial of causes, criminal or civil, brings out with cameo-like clearness two methods of trial. When one method is resorted to, procedure questions are given such prominence that the substantial questions of fact or of substantive law are wholly or almost lost to view. When the other method is employed counsel and parties by an agreement, tacit or expressed, join in presenting the substantial issues which arise in the case, and as the phrase is, agree to try the case on its merits without regard to form.

The injunction of Rev. St. § 1025, was laid upon the courts with the contrast between these two systems of trial practice in the mind of Congress, and the command is that no indictment shall be held to be insufficient or effect be refused to a verdict if the indictment and trial be such as that a trial may be had and the trial is had in accordance with the second method described. This, as we understand it, is what Congress means in saying that the test of every question of this character which is raised is whether or not there has crept into the indictment or the trial anything which has worked to the prejudice of the defendants. There is a class of distinctions with which highly trained and bright intellects love to deal which may fitly be characterized as metaphysical. As an intellectual exercise, discussion of them is always pleasurable and may have a high didactic value, but the practical affairs of life cannot be made to await the end of the discussion.

We adhere to the view entertained by the trial judge that the indictment charged and the evidence supports the offense defined by the Espionage Law relating to the making of false reports, etc.

The second of the points remaining for discussion in the cause arises out of that part of the charge which dealt with the distinction between treason and the acts condemned by the Espionage Law (Act June 15, 1917, c. 30, 40 Stat. 217) as criminal. As has often been observed, a charge to a jury should always be read in the atmosphere of the trial in which it was delivered. One of the functions of the charge is to enable a jury to comprehend the issues of a cause as presented to them by the evidence and the arguments of counsel. The cause which they have in their minds as the one to be determined by them is the cause as thus presented, and it would only work confusion if the trial judge did not shape the charge accordingly. There was evidently, as the charge itself indicates, some occurrence of the trial which prompted the comment of which complaint is now made. A part of that complaint is that the comment was irrelevant and tended to prejudice the defendants.

There is nothing which we have been able to find in the record which either suggests or revives a recollection of what the happening was. In the absence of any such recollection, it must be left to

surmise. As counsel for the defendants now read the charge, and perhaps as they heard it, they have received the impression that the charge magnified the crime laid in the indictment. Such was not its purpose, nor do we think its practical effect. The jury was made up of high-minded and intelligent men. This does not mean that they would not be swayed by the emotions which we all feel when what we call our love of country is hurt; but it does mean that they would distinguish between acts which have been made criminal and publications or speeches which affect us unpleasantly. Aside from the particular happening, whatever it was, which provoked this part of the charge, the comments complained of had evidently a double purpose. One was that it would not follow that, because mere words might not be overt acts of treason, mere words could not constitute a crime. The other is that, no matter how objectionable they might be to the hearer or the reader, because coming within the category of what was disloyal, or what would be in the common acceptation treasonable, they would not be a crime, in the legal sense, of which any one could be convicted, unless the objectionable acts had been declared to be a crime by some act of Congress. This thought is, we think, clearly expressed in the main charge, and is certainly clearly presented in what was added to the main charge upon exception taken by defendants.

The point now made is properly enough vigorously pressed by counsel, and we have given it very careful consideration. The result is we are unable to see in this any reason for interference with the verdict.

[2] The benefit of the third point is limited to the defendants Lemke, Schafer, and Vogel. Its application to Lemke is not conceded. Some countenance is lent to it by the act of the district attorney in not asking the jury for the conviction of Schafer and Vogel, except upon the conspiracy count. The connection of these two men with the publication was such as, we assume, to admittedly affect the degree of guilt, and because of this is a consideration in the imposition of sentence. What may in a sense be called their formal responsibility for the publication furnishes in itself evidence to be submitted to a jury. Their real connection with it was at least this: That while their main motive in being parties to the publication of the newspaper was to promote the interests of the organization with which they were connected, there were justifying grounds for the finding that in order to promote this interest they were not only willing, but deemed it helpful, that the newspaper as the organ of their organization should assume an attitude which the jury has found to be a disloyal one. The truth many be that their motive was not a disloyal one, in the sense that they wished to promote the success of the enemies of the United States; but the evidence again justified the finding that their intent was an unlawful one, because they could not cater to those whose support they sought, unless they did have the newspaper do all which it could do toward promoting the success of that government with the people of which we were at war. Indeed, in disclaiming disloyal motives, there was a plain, if not a frank, admission of this intent, and of the selfish reason behind it.

We do not find this reason for a new trial to be any ground for interference with the verdict.

[3] Perhaps one other thing calls for some comment. There was an attempt made to express in the charge to the jury the thought that with respect to all matters which are matters of general information the jury had the right to call upon this fund of general knowledge which was in their keeping. This must be so, because there is no practical method of having such a state of facts enter into the make-up of a judgment other than by drawing upon this fund. The kind of knowledge which is based upon what are classified as historical facts supplies us with an illustration of the distinction intended. The quoted parts of the charge dealing with this thought were not very happily, or at least very clearly, expressed. What was in mind was that the jury would want to know how they were to deal with certain questions which were essentially questions of fact, and yet in respect to which there was, strictly speaking, no evidence.

One of these was the question of the existence of a state of war. This was in no important sense a question, but with respect to how a state of war could be found to be a fact, the method employed afforded an illustration of how these other questions of fact with which the jury had to deal, which were matters of general knowledge, could be met. Many instances of so-called propaganda in this and other countries may be used as illustrations. What is put out is known to be false, because so pronounced by the information which is common to all. The question, however, is what will justify a finding of falsity? Upon what can the finding be based? The answer is that, if the statements made are of matters which are the subject of general information and are part of our common knowledge, their truth or falsity may be thus tested. The line between what may be thus tested and a specific fact, which must be proven, is a line which cannot otherwise be defined than by the statement that we may judge of anything which is within, and the subject of common knowledge, although we may have no other light leading us to a judgment than that afforded by such common knowledge as we have.

The complaint made is that the instruction given was so general as to be misleading, and was fraught with danger (to use an extravagant illustration) that the jury might accept it as a warrant, in cases which had aroused a popular interest and in that sense were matters of common knowledge, to convict defendants who were thus commonly thought to be guilty.

We have carefully re-read the charge with the thought thus indicated in mind, and when read in the light of the events of the trial and of the arguments addressed to the jury, we cannot think the jury failed to grasp the distinction made between those things of which judicial notice could be taken and facts which must be affirmatively and even formally established by evidence.

The motions in **arrest of judgment and for a new trial** are discharged.